# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# LAFAYETTE-OPELOUSAS DIVISION

| | | |
|---|---|---|
| **BRODY MELANCON** | * | **CIVIL ACTION NO. 05-0633** |
| **VERSUS** | * | **JUDGE MELANÇON** |
| **COMMISSIONER OF SOCIAL SECURITY** | * | **MAGISTRATE JUDGE HILL** |

## REPORT AND RECOMMENDATION

This social security appeal was referred to me for review, Report and Recommendation pursuant to this Court's Standing Order of July 8, 1993. Brody Melancon, born November 23, 1975, filed applications for disability insurance benefits and supplemental security income payments on October 16, 2002, based on neck and back problems with pain, and pain in his hip down his right knee, with an onset date of August 18, 2002.

## FINDINGS AND CONCLUSIONS

After a review of the entire administrative record and the briefs filed by the parties, and pursuant to 42 U.S.C. § 405(g), I find that there is not substantial evidence in the record to support the Commissioner's finding that the claimant was not disabled and that this case should be remanded for further proceedings.

In fulfillment of F.R.Civ.P. 52, I find that this case should be remanded for further proceedings, based on the following:

**(1) Records from St. Martin Hospital dated August 15, 2002**. Claimant was admitted for right shoulder and lower back pain after a motor vehicle accident. (Tr. 123). Cervical spine x-rays were normal. (Tr. 127). The impression was lumbar strain, for which he was prescribed Vioxx. (Tr. 125).

**(2) Records from St. Martinville Physical Therapy Clinic dated August 29, 2002 to October 29, 2002**.[1] Dr. Troy Martin referred claimant for physical therapy. (Tr. 149). He went for 18 visits. (Tr. 130-33). At the end of the sessions, he had increased cervical range of motion, decreased lumbar range of motion, increased flexibility, increased cervical mobility, and good tolerance to exercises. (Tr. 133).

**(3) Report from Dr. Troy Martin dated November 4, 2002**. Dr. Martin reported that he saw claimant on August 29, 2002, after a motor vehicle accident. (Tr. 151). He complained of pain in his neck, right shoulder, low back, right hip, and right knee, as well as headaches. He was started on physical therapy, pain relievers and muscle relaxers.

---

[1] Physical therapists qualify as "other sources" under 20 C.F.R. § 404.1513(e) which sources may be considered but are entitled to significantly less weight than "acceptable medical sources." *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996).

After claimant finished his therapy, he still complained of pain in his neck, shoulders, low back, but his headaches had decreased to approximately two per week. He desired to see an orthopedist. Dr. Martin opined that claimant had some ability to perform work-related activities such as sitting, standing, walking, lifting, carrying, and handling objects. (Tr. 152). He noted that claimant had no evidence of mental impairments. However, he thought that permanently disabling claimant was "a bit premature," since he was less than three months out from his accident.

**(4) Records from Dr. Angela Mayeux dated November 27, 2002 and December 12, 2002**. On November 27, 2002, claimant complained of right shoulder pain with weakness in his arm, headaches, right-sided flank pain, back pain with radiation past his knees, pain in the top and bottom of his foot and on the lateral side of his knee, muscle weakness in his leg, and difficulty initiating urination. (Tr. 156-57). On examination, he had full range of motion in his neck and back. (Tr. 157). He had tenderness in his scapula and at the right A-C joint. Deep tendon reflexes were 2+ and symmetrical. He had all of the signs and symptoms of right rotator cuff impingement tendonitis with no evidence of a tear.

Claimant could rise on his toes, rock back on his heels, and single leg stand. Motor was 5/5 in all groups. Sensory was intact. Deep tendon reflexes were 3+ and symmetrical. He had no evidence of nerve root tension signs, atrophy, or sacroiliitis.

Dr. Mayeux's impression was status-post motor vehicle accident with complaints of neck pain and headache, right-sided rotator cuff impingement tendonitis, and complaints of low back pain with radiculitis and a relatively normal physical examination. She injected claimant's right shoulder, and prescribed Lortab. (Tr. 157-58).

An MRI dated December 12, 2002, showed central canal stenosis at L3-L4 and L4-L5. (Tr. 155). There was also intervertebral disc disease at L5-S1.

**(5) Records from Medical Center of Louisiana at New Orleans dated November 6, 2003**. Claimant had a history of neurofibromatosis[2] and status-post MVA for 11 months. (Tr. 169). He complained of lower back pain and right leg

---

[2]Under this heading are grouped two distinct hereditary disorders, formerly labeled peripheral and central neurofibromatosis, but now entitled neurofibromatosis type 1 and type 2. Type 1 (peripheral) neurofibromatosis, [MIM*162200] by far the most common of the two types, is characterized clinically by the combination of patches of hyperpigmentation and cutaneous and subcutaneous tumors. The hyperpigmented skin areas, present from birth and found anywhere on the body surface, can vary markedly in size and color—the dark brown ones are called café-au-lait spots. The multiple cutaneous and subcutaneous tumors, nerve sheath neoplasms, called neurofibromas, can develop anywhere along the peripheral nerve fibers, from the roots distally. Neurofibromas can become quite large, causing a major disfigurement, eroding bone, and compressing various peripheral nerve structures; a small hamartoma (Lisch nodule) can be found in the iris of almost all patients. Type 1 neurofibromatosis, also called von Recklinghausen disease, has autosomal dominant inheritance, with the gene locus on chromosome 17q11, and is caused by mutation in the NF1 gene that encodes neurofibromin. Type 2 (central) neurofibromatosis [MIM*101000] has few cutaneous manifestations, and consists primarily of bilateral (less often, unilateral) acoustic neuromas, causing deafness, often accompanied by other intracranial and paraspinal neoplasms, such as meningiomas and gliomas. Type 2 neurofibromatosis also has autosomal dominant inheritance, but the gene locus is on 22q11, caused by mutation in the NF2 gene encoding the product merlin. SYN elephant man's disease (2). STEDMAN'S MEDICAL DICTIONARY (27th ed. 2000).

radiculopathy to the foot with occasional leg weakness, and neck pain with occasional radiculopathy to the right arm and fingers.

A lumbar discogram revealed a left post-lateral fissure at L4-5, and diffusely disorganized appearance of the nucleogram with circumferential fissuring, positive pain response described as right low back and right hip pain at L5-S1. (Tr. 167).

**(6) Consultative Examination by Dr. Harold A. Heitkamp dated February 10, 2004**. Claimant complained of pain in his neck, back, hips, and shoulders. (Tr. 171). He had a 12th grade education, and could read and write. He stated that he had been diagnosed with neurofibromatosis since he was a child. He reported that he had an infection in his right eye, and had gone to the emergency room earlier that month for severe pains in his abdomen and difficulty urinating. (Tr. 171-72). His medications included Lortab, Elavil, Percocet, Neurontin, Limbitrol, and Bextra. (Tr. 172).

On examination, claimant was obese at 5 feet 9 inches tall and 258 pounds. His vision without glasses was 20/200 and 20/15 right eye, and with glasses was 20/40 right and 20/15 left. (Tr. 173). He had a normal gait. He had several small masses about ½ cm in length on his right forearm and right foot, probably fibromytoma.

Claimant's neck had some bilateral spasm in the cervical area. He was tender at C5 to T1 on the left, and had trigger areas in the right trapezius. He had full

flexion, extension, and rotation, but lateral flexion was diminished to 25 degrees (normal 45) on the right and 20 degrees on the left.

In the upper extremities, claimant was tender over the biceps tendon, but had good range of motion and strength. He had no atrophy, normal wrists, good hand strength and grasping ability, and adequate dexterity. He had normal sensation to pin prick.

In the lumbar spine, claimant could squat 60 degrees (normal 95), and complained of pain in his back and knees. He could get up on his toes and take a step, and could get back on his heels. He had no spasm or definite tenderness. Range of motion was 60 degrees forward flexion (normal 90), 20 degrees extension (normal 30), and 30 degrees left lateral flexion and 20 degrees right (normal 30).

Claimant's biceps reflexes were 0 to 1+, patella were 2+ right and 2 ½+ left, and Achilles 1 ½+ right and 2+ left. Straight leg raising tests were negative. Right hip flexion was 90 degrees (normal 100), and the left hip had full range of motion. The knees had no ligamentous weakness, no effusion, and full range of motion. Ankles were normal.

Dr. Heitkamp's impressions were a herniated disc at L5-S1 by discogram with no radiculopathy, multiple neurofibromatosis, and a right eye infection which was being treated by an ophthalmologist. (Tr. 174). He opined that with claimant's

findings of herniated L5-S1 disc and limitation of flexion, his limitations would be very light duty, no lifting over 20 pounds occasionally and 5 to 10 pounds repetitively, and no restrictions in the seated position. He noted that claimant was markedly limited to mostly doing things in the sedentary position and minimal lifting. He also limited claimant to no standing over 20 minutes at a time, which he could alternate with sitting.

In the Medical Source Statement of Ability to do Work-Related Activities (Physical), Dr. Heitkamp found that claimant could lift/carry 20 pounds occasionally and less than 10 pounds frequently. (Tr. 175). He could stand/walk at least 2 hours in an 8-hour workday. He could sit for less than 6 hours in an 8-hour workday. (Tr. 176). He was limited in the upper and lower extremities as to pushing and pulling. He could frequently kneel, and occasionally climb, balance, crouch, crawl, and stoop. He was limited to hazards such as machinery and heights, but had no other environmental limitations. (Tr. 178).

**(7) Records from LSU-University Medical Center ("UMC") dated February 7, 2004 to June 1, 2004**.[3] On February 7, 2004, claimant complained of back problems and urinary hesitancy. (Tr. 201). An ECG was normal. (Tr. 198). X-rays showed prominent bowel distention. (Tr. 194). A hepatic ultrasound revealed

---

[3]Some of these records are illegible.

mild splenomegaly and no evidence of cholelithiasis. (Tr. 193). A barium swallow showed a small hiatal hernia with no evidence of gastroesophageal reflux. (Tr. 188, 191).

An MRI of the cervical spine dated February 20, 2004, showed broad based disc bulges with no evidence of central canal stenosis. (Tr. 192).

AN MRI of the head/brain showed what appeared to be a prominent arachnoid cyst[4] in the region of the right temporal lobe, as well as a possible arachnoid cyst near the third ventricle. (Tr. 180).

**(8) Consultative Examination by Dr. Sujal Shah dated September 18, 2004**. Claimant complained of back, neck, and right knee pain. (Tr. 208). He also reported having monthly throbbing headaches lasting about an hour, which were relieved with analgesics. He had been diagnosed with neurofibromatosis.

Claimant reported that he was able to dress and feed himself; stand for 10 minutes at a time at the most, and 20 to 30 minutes over an 8-hour span; did not really walk anymore; did not lift objects and had trouble lifting his 2-year-old son, and was not really able to do any household chores. His medications included Bextra, Amitriptyline, Lexapro, Tizanidine, and Lortab.

---

[4] A fluid-filled cyst lined with arachnoid membrane, frequently situated near the lateral aspect of the fissure of Sylvius; usually congenital in origin. STEDMAN'S MEDICAL DICTIONARY (27th ed. 2000).

8

On examination, claimant was 73 inches tall and weighed 262.5 pounds. (Tr. 209). He was able to ambulate normally, and had no difficulty getting on and off the table, getting out of the chair, or taking off his shoes or pants.

Claimant had good radial and pedal pulses. He had no clubbing, cyanosis, edema, swelling, redness or effusion. He had 5/5 grip strength bilaterally.

In the upper extremities, claimant had full range of motion. He was able to flex 40 out of 40 degrees and extend about 30/40 in the cervical spine. Lateral flexion was limited to 20/40. He was able to rotate his head 40/80.

Lumbar flexion was limited to 30/90. Lateral flexion was 10/20, hip flexion was 60/110 on the right and 80/100 on the left, and internal rotation was 30/45 on the right and 35/45 left. Straight leg raising was negative. He was able to lie back on the table, walk on his heels and toes, and walk heel to toe. He could squat with difficulty.

Neurologically, claimant had 5/5 proximal motor strength. (Tr. 210). Deep tendon reflexes were 2+ bilaterally in his ankles and knees.

Dr. Shah's impression was that claimant had limited range of motion due to his lumbar disc bulge.

In the Medical Source Statement of Ability to do Work-Related Activities (Physical), Dr. Shah found that claimant was limited to lifting/carrying 20 pounds occasionally and 10 pounds frequently. (Tr. 211). He had no limitations as to

9

standing, walking, sitting, or pushing and pulling. (Tr. 212). He could occasionally balance, but never climb, kneel, crouch, crawl, or stoop.

**(9) Claimant's Administrative Hearing Testimony**. At the hearing on December 24, 2003, claimant testified that he was 5 feet 9 inches tall and weighed 270 pounds. (Tr. 242). He reported that he last worked on August 15 in the maintenance department at a casino. (Tr. 232-33). He stated that he left after he got into an accident in which he hurt his neck and back. (Tr. 233). He said that still had pain in his shoulder, low back, neck, and knees.

Claimant reported that he was being treated at UMC in New Orleans. (Tr. 234). He testified that the doctors were giving him pain medications and were going to do injections. He said that the medication helped "a little bit." He reported that he had side effects from his medications, including sleepiness and having a hard time speaking. (Tr. 241).

Regarding activities, claimant testified that he could not drive because he had problems turning his neck and looking in the mirrors. (Tr. 235). He stated that during the course of a day, he made his bed, watched television, sat for a little, while and stood up. He also attended church with his mother. (Tr. 237).

As to restrictions, claimant reported that he could stand or walk for about 20 minutes, then had to sit down. (Tr. 235). He said that he could sit for about an hour

in the recliner when he was on medications, and 20 minutes when he was not. (Tr. 236). He testified that the heaviest thing that he could lift regularly was his son, who was 13 months old.

Additionally, claimant testified that he had trouble putting his shirt on and raising his arms because of neck pain. (Tr. 237). He also said that he had problems putting his shoes on because of his low back pain.

**(10) Administrative Hearing Testimony of Linda Bailey**. Claimant's mother, Linda Bailey, testified that claimant was supposed to start injections on his lower back, and had MRIs of the brain and cervical spine scheduled. (Tr. 239). Additionally, she reported that the doctor at UMC wanted to increase claimant's Neurontin from 900 milligrams to 3600 milligrams a day. She also said that he had an appointment for his right eye, and he had neurofibromatosis and spinal stenosis. (Tr. 239-40).

**(11) Administrative Hearing Testimony of Charles Smith, Vocational Expert ("VE")**. A supplemental hearing was held on August 24, 2004, for the purpose of receiving vocational expert testimony. (Tr. 248). The ALJ asked Mr. Smith to assume a younger individual with a high school education and the same work history; who was limited to no lifting over 20 pounds occasionally and 5 to 10 pounds repetitively; no restrictions in the seated position; no standing over 20

11

minutes at a time; had limitations in pushing and pulling in the extremities, and was limited to postural activities on an occasional basis only. (Tr. 249-50). In response, the VE testified that these limitations would not impact work at the sedentary level. (Tr. 250). When the ALJ added the limitations of no repetitive use of foot controls or pedals, and no overhead work, the VE testified that those would not significantly impact the number of the sedentary jobs. (Tr. 250-51).

**(12) The ALJ's Findings**. Claimant argues that: (1) the ALJ erred in failing to evaluate the combined effect of his medical impairments, including his diagnosis of neurofibromatosis and archnoid cysts, the side effects of claimant's medications, central canal stenosis, obesity, and his vision problems, and (2) the ALJ erred in failing to develop the record as to claimant's educational ability. Because I find that the ALJ failed to develop the record as to claimant's diagnoses of neurofibromatosis and obesity, and also failed to consider the side effects of claimant's medications, I recommend that this case be **REMANDED** for further proceedings.

The record reflects that claimant had neurofibromatosis. (Tr. 169, 171-72, 174, 184, 186, 201, 208, 240). In 2004, the consultative examiner, Dr. Heitkamp, noted that claimant had "multiple neurofibromatosis." (Tr. 173-74). Despite the repeated evidence of this condition throughout the medical records, the ALJ did not refer to neurofibromatosis at any point in his decision. (Tr. 15-24). This constitutes error.

12

Additionally, claimant asserts that the ALJ erred in failing to consider the combined effects of his obesity with his various complaints in accordance with SSR 02-1p. Prior to 1999, the Social Security regulations included a listing for obesity. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 9.09 (1999).[5] On August 24, 1999, the Commissioner published a final rule, deleting § 9.09 for obesity. 64 FR 46122 (1999). This listing was deleted because experience showed that the criteria in § 9.09 were not appropriate indicators of listing-level severity. SSR 02-01p (September 12, 2002). The final rule was effective on October 25, 1999. *Id*.

Even though the listing at 9.09 was deleted, obesity is still addressed in the listings. SSR 02-01p. Paragraphs were added to the prefaces of the musculoskeletal, respiratory, and cardiovascular body system listings that provide guidance about the potential effects obesity has in causing or contributing to impairments in those body systems. *Id*. Section 1.00Q, which was added to the musculoskeletal listing, states that obesity is considered to be a medically determinable impairment, and reminds adjudicators to consider its effects when evaluating disability. *Id*.; 20 C.F.R. Pt. 404, Subpt. P, Appendix 1 § 1.00Q. This provision also remind adjudicators that the

---

[5]The criteria for the musculoskeletal impairment under § 9.09 was a "[h]istory of pain and limitation of motion in any weight-bearing joint or the lumbosacral spine (on physical examination) associated with findings on medically acceptable imaging techniques of arthritis in the affected joint or lumbosacral spine."

combined effects of obesity with musculoskeletal impairments can be greater than the effects of each of the impairments considered separately. *Id.* Therefore, "when determining whether an individual with obesity has a listing-level impairment or combination of impairments, and when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity, adjudicators *must* consider any additional and cumulative effects of obesity." (emphasis added). *Id.*

A review of the decision reflects that nowhere did the ALJ refer to § 1.00Q, nor does the record reflect that the ALJ considered the combined effects of obesity with claimant's musculoskeletal impairments as required by the regulations. The medical records, particularly those from Dr. Heitkamp and UMC, consistently reflect that claimant was "obese." (Tr. 172, 183, 209). However, the ALJ failed to consider "any additional and cumulative effects of obesity" as required by §§ 1.00Q and SSR 02-1p. Thus, the ALJ erred in assessing claimant's impairments.

Further, the record reflects that claimant was taking several prescription pain medications, including Lortab and Percocet. (Tr. 172, 195, 201, 208). These are both narcotic medications designed for the relief of moderate-to-severe pain. Under the regulations, the Commissioner is required to consider the "type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken

to alleviate [] pain or other symptoms." *Crowley v. Apfel*, 197 F.3d 194, 199 (5th Cir. 1999) (citing 20 C.F.R. § 404.1529(c)(3)(iv)). Claimant testified that his medicines made him sleepy and caused him to have a hard time speaking sometimes. (Tr. 241). The ALJ did not take the side effects of claimant's medications into consideration, and his failure to do so was error.

Accordingly, the undersigned recommends that this case be **REMANDED** to the Commissioner for further administrative action pursuant to the fourth sentence of 42 U.S.C. § 405(g). This includes, but does not limit, sending the case to the hearing level with instructions to the Administrative Law Judge to evaluate claimant's neurofibromatosis, obesity, and the side effects of his medications. Claimant shall be afforded the opportunity to submit additional evidence and to testify at a supplemental hearing. Inasmuch as the remand recommended herein falls under sentence four of Section 405(g), any judgment entered in connection herewith will be a "final judgment" for purposes of the Equal Access to Justice Act (EAJA). See, *Richard v. Sullivan*, 955 F.2d 354 (5th Cir. 1992) and *Shalala v. Schaefer*, 509 U.S. 292 (1993).

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have ten (10) business days from service of this Report and Recommendation to file specific, written objections with the Clerk

of Court. A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN TEN (10) DAYS FOLLOWING THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT, EXCEPT UPON GROUNDS OF PLAIN ERROR.** *DOUGLASS V. UNITED SERVICES AUTOMOBILE ASSOCIATION***, 79 F.3D 1415 (5TH CIR. 1996).**

Signed this 14th day of July, 2006 at Lafayette, Louisiana.

_____
C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE

16

17